552 So.2d 194 (1989)
WARREN FINANCE, INC., Etc., Petitioner,
v.
BARNETT BANK OF JACKSONVILLE, N.A., Etc., Respondent.
No. 73350.
Supreme Court of Florida.
November 16, 1989.
*195 Steven A. Werber of Commander, Legler, Werber, Dawes, Sadler & Howell, P.A., Jacksonville, for petitioner.
George L. Hudspeth, Robert J. Winicki and David E. Otero of Mahoney, Adams, Milam, Surface & Grimsley, and James A. Bledsoe, Jr. of Bledsoe & Schmidt, P.A., Jacksonville, for respondent.
McDONALD, Justice.
We have for review Barnett Bank v. Warren Finance, Inc., 532 So.2d 676 (Fla. 1st DCA 1988), in which the district court certified the following question as one of great public importance:
May the issuing bank assert the defenses of a payee or endorsee against the right of a subsequent endorsee to receive payment on a cashier's check?
Id. at 681. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the certified question in the negative and quash the district court's decision.
Warren Finance, Inc., (Warren) entered into a financing agreement with Redan Engineering (Redan) whereby it advanced funds to Redan. Pursuant to this agreement, Redan assigned its rights to payments due under its construction contracts to Warren. Redan received three checks from Blossam Contractors, Inc., and T. Butler Company totaling $221,443.35. Redan gave these checks to Warren, which requested cashier's checks in lieu of the personal checks due to previous collection problems. According to Redan, Warren agreed to advance additional funds to cover outstanding checks written to suppliers and materialmen in exchange for the three checks issued to Redan by Blossam and Butler.
Redan and Warren went to Blossam's depository bank, Barnett Bank of Jacksonville (Barnett), to have the checks exchanged for cashier's checks. Barnett issued three cashier's checks in exchange for the personal checks, with Blossam and Butler as named purchasers and Redan as payee. Redan endorsed the cashier's checks to Warren, which immediately deposited the checks in its account at another bank. Warren subsequently refused to advance any additional funds to Redan, which then sought to stop payment, alleging that it had been defrauded into endorsing over the checks. Redan contacted Blossam, the purchaser of the cashier's checks, and requested that Blossam stop payment on the checks due to Warren's actions. Blossam agreed to assist Redan and telephoned Barnett to request that Barnett stop payment on the cashier's checks. Barnett then contacted Redan and, based on Redan's allegations of fraud and Blossam's request, refused to honor the checks. Barnett later issued replacement checks to Redan, which soon thereafter was declared bankrupt involuntarily.
Warren then brought this action against Barnett, contending that Barnett wrongfully dishonored the cashier's checks. Barnett defended its actions on the basis that Warren was not a holder in due course and asserted the defense of fraud in the underlying transaction between Redan and Warren. The trial court found in favor of Warren and ordered payment of $221,443.35 plus interest. The First District Court of Appeal reversed the trial court's decision and held Barnett could refuse payment on the cashier's checks by asserting the fraud claim of Redan if Warren were not a holder in due course. The district court then remanded the case back to the trial court for a hearing to determine Warren's holder in due course status. The certified question presented in this case involves an issue of first impression to this Court.
It is important to discuss the purpose and use of a cashier's check to determine the respective rights and liabilities of parties to that check. The purpose of a cashier's check is to act as a cash substitute in dealings between parties. Parties using cashier's checks in place of ordinary checks or instruments do so because cashier's checks do not carry the risk of litigation costs or insolvency. Lawrence, Making *196 Cashier's Checks and Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code, 64 Minn.L.Rev. 275, 279-80 (1980). Frequently used in business transactions, cashier's checks add a degree of certainty to dealings between parties. A cashier's check, unlike an ordinary check, stands on its own foundation as an independent, unconditional, and primary obligation of the bank. Pennsylvania v. Curtiss National Bank, 427 F.2d 395 (5th Cir.1970); Riverside Bank v. Maxa, 45 So.2d 678 (Fla. 1950); Crosby v. Lewis, 523 So.2d 1154 (Fla. 5th DCA 1988). People accept a cashier's check as a substitute for cash because the bank stands behind the check, rather than an individual. National Newark & Essex Bank v. Giordano, 111 N.J. Super. 347, 268 A.2d 327 (1970). Because the bank, and not the drawer, is personally liable, the holder of a cashier's check knows that upon presentment the issuing bank will honor its obligation. Therefore, the public uses cashier's checks because they are a reliable vehicle for transferring funds, are as freely transferrable as cash, and are free of the risks of loss and theft that accompany cash. When used in place of a personal check or other negotiable instrument, the parties' expectation is that the cashier's check will remove all doubt as to whether the instrument will be returned to the holder unpaid due to insufficient funds in the account, a stop payment order, or insolvency.
Notwithstanding the foregoing, banks occasionally refuse to honor cashier's checks. Basically, courts have developed two general approaches regarding the circumstances under which a bank may refuse payment on its cashier's check without incurring liability. The first approach is the cash equivalent theory. Proponents of this approach argue that, once a bank has issued a cashier's check, it may not subsequently stop payment and refuse to honor the check. The second approach is the note theory, which treats a cashier's check as an ordinary negotiable instrument. This approach allows banks to refuse payment on their cashier's checks, but only under limited circumstances.
The majority of courts which have adopted the cash equivalent theory begin their analysis with the common law rule that a cashier's check is a cash equivalent and not subject to countermand once issued by the bank. Swiss Credit Bank v. Virginia National Bank-Fairfax, 538 F.2d 587 (4th Cir.1976); Pennsylvania v. Curtiss National Bank; Abilities, Inc. v. Citibank, N.A., 87 A.D.2d 831, 449 N.Y.S.2d 242 (1982). See Riverside Bank v. Maxa, 45 So.2d at 680. These courts recognize that cashier's checks play a significant role in commercial practices by furthering certainty in commercial transactions. Da Silva v. Sanders, 600 F. Supp. 1008, 1013 (D.D.C. 1984). In order to preserve the cash-like attributes of cashier's checks, courts which adopt the cash equivalent approach rely upon section 4-303 of the Uniform Commercial Code (UCC) which states, in effect, that, if the bank has already accepted the check, any stop payment order comes too late to terminate the bank's duty to pay.[1] These courts hold cashier's checks to be analogous to certified checks, which, pursuant to section 3-411, are accepted when certified by the bank.[2] By equating certification of a check to issuance of a cashier's check, courts following this approach hold that a bank cannot stop payment *197 of a cashier's check because that check has been accepted upon issuance and section 4-303 prohibits stop orders on accepted items. Therefore, a bank may not refuse to honor its cashier's check when presented for payment based either on its own defenses or the defenses of another party to the check. See Swiss Credit Bank v. Virginia National Bank; Munson v. American National Bank & Trust Co., 484 F.2d 620 (7th Cir.1973); Wertz v. Richardson Heights Bank & Trust, 495 S.W.2d 572 (Tex. 1973); National Newark & Essex Bank v. Giordano.
Although we agree with the need to uphold the cash-like attributes of cashier's checks, we disagree with framing the issue in terms of "stop payment." The concept of stopping payment has relevance only to relations between the bank and its customer. Because a personal check is simply an order to pay, a customer has the right to revoke the order before it is carried out. Hawkland, Stop Payment Orders Under the Uniform Commercial Code, 75 Com.L.J. 53 (1970). In comparison, a cashier's check is payable from the issuing bank's own account. Because the bank, as both drawer and drawee, is its own customer when it issues a cashier's check, the bank cannot be liable to itself for failing to stop payment on the check. See Rezapolvi v. First National Bank, 296 Md. 1, 10 n. 7, 459 A.2d 183, 188 n. 7 (1983); Santos v. First National State Bank, 186 N.J. Super. 52, 65, 451 A.2d 401, 408 (1982); Lawrence, supra, 64 Minn.L.Rev. at 285 n. 59; Benson, Stop Payment of Cashier's Checks and Bank Drafts Under the Uniform Commercial Code, 2 Ohio N.L.Rev. 445, 448 (1975). Neither the bank nor a purchaser of a cashier's check from the bank has a right to "stop payment" on a cashier's check. A bank may refuse to pay the check upon presentment, but the real issue is whether the bank has any legal basis for defeating the holder's subsequent action for payment.
We acknowledge that any objection to the cash equivalent theory based solely upon the misapplication of the term "stopping payment" to a bank's dishonor of a cashier's check may be unduly narrow. J. White & R. Summers, Uniform Commercial Code 645 (3d ed. 1988). Section 4-303 also includes the phrase "any knowledge received by payor bank" and states that any such knowledge comes too late to terminate the bank's obligation to pay if the bank has accepted the check. It is arguable that this language should apply in the case at hand. Barnett received knowledge of the alleged fraud after it had issued the cashier's checks. Thus, that knowledge came too late to terminate Barnett's obligation to pay. The text of section 4-303 and the accompanying comments, however, indicate the section was drafted to settle the relative priorities of conflicting claims to a customer's account and not to cut off a bank's right to assert its own defenses against an instrument drawn on its own account. Farmers & Merchants State Bank v. Western Bank, 841 F.2d 1433 (9th Cir.1987); J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 692 (2d ed. 1980). We therefore decline to adopt the cash equivalent theory as applied through section 4-303.
In contrast to the cash equivalent courts, other courts have adopted the note theory approach. Although courts following this approach also recognize the need to uphold the cash-like attributes of cashier's checks, they hold that under limited circumstances a bank may be allowed to refuse payment without incurring liability. Because, in effect, a bank draws on itself when it issues a cashier's check, the courts which adopt the note approach begin their analysis by relying upon section 3-118 which states that "[a] draft drawn on the drawer is effective as a note." Hence, they hold that, because a cashier's check is effective as a note, the provisions of the UCC dealing with ordinary negotiable instruments should be applied. TPO Inc. v. Federal Deposit Insurance Corp., 487 F.2d 131 (3d Cir.1973); Banco Ganadero y Agricola, S.A. v. Society National Bank, 418 F. Supp. 520 (N.D.Ohio 1976); Laurel Bank & Trust Co. v. City National Bank, 33 Conn. Supp. 641, 365 A.2d 1222 (1976). See *198 Benson, supra, 2 Ohio N.L.Rev. at 449; Lawrence, supra, 64 Minn.L.Rev. at 288.
Treating a cashier's check as an ordinary note enables courts to determine what defenses a bank may assert to avoid liability on its dishonored cashier's check based on the status of the holder of that check. If a payee or endorsee of a cashier's check is a holder in due course, courts apply section 3-305[3] and limit the bank's defenses to those defenses real to the bank. See Farmers & Merchants State Bank v. Western Bank, 841 F.2d at 1442; Santos v. First National Bank, 186 N.J. Super. at 60, 451 A.2d at 406. On the other hand, if the payee or endorsee is determined to be a nonholder in due course, courts adopting the note approach apply section 3-306[4] and permit the bank to assert its real and personal defenses. See Pennsylvania v. Curtiss National Bank, 427 F.2d at 399; Banco Ganadero y Agricola v. Society National Bank, 418 F. Supp. at 524; Laurel Bank & Trust Co. v. City National Bank, 33 Conn. Supp. at 643, 365 A.2d at 1224.
Turning to the instant case, Barnett argues that, if courts allow banks to assert their real and personal defenses against a nonholder in due course pursuant to section 3-306, then it should be allowed to assert as a defense the claim of any third party to the cashier's check under subsection 3-306(4). This would allow Barnett to assert Redan's fraud claim as a defense against Warren's action for payment and avoid liability on the check, assuming that Warren is not a holder in due course.
We disagree with Barnett's argument for several reasons. Banks should not be placed in a position that requires them to determine the respective rights of parties to a cashier's check prior to paying the holder of the check. The actual dispute in this case pertains to the underlying transaction between Redan and Warren, i.e., whether Warren defrauded Redan into transferring the cashier's checks to Warren. The issuance of a cashier's check is a distinct and separate transaction from that underlying dispute. Comment 5 to section 3-306 addresses this point and states in part:
The contract of the obligor is to pay the holder of the instrument, and the claims of other persons against the holder are generally not his concern. He is not required to set up such a claim as a defense, since he usually will have no satisfactory evidence of his own on the issue; and the provision that he may not do so is intended as much for his protection as for that of the holder... . The provision includes all claims for rescission of a negotiation, whether based on incapacity, fraud, duress, mistake, illegality, *199 breach of trust or duty or any other reason.
(Emphasis added.)
If we were to accept Barnett's contention that a determination of the bank's liability is contingent upon a finding of fraud in the underlying transaction between Warren and Redan, the case at bar would be premature. That proper action lies in the dispute between Warren and Redan. A bank should not be required or allowed to act as an intermediary between parties disputing as to who is the rightful holder of a cashier's check. This is a function best reserved for the courts.[5]
We also refuse to adopt the note theory approach upon which Barnett bases its argument. Our objection to the note theory stems from the original premise upon which the theory is based, i.e., the language in section 3-118 that "a draft drawn on the drawer is effective as a note." Although a cashier's check is, in effect, a draft drawn on the drawer, characterizing a cashier's check as a simple note ignores the very purpose of a cashier's check. A cashier's check is a specialized form of note, intended to be a cash substitute, and not subject to the difficulties incurred in collecting an ordinary note. Any determination of rights of parties to a cashier's check based on a provision in the UCC which does not distinguish between different types of notes fails to take into account the special cash-like characteristics of a cashier's check.
Further, when a payee or endorsee presents a cashier's check for payment, its right to payment should not depend on its status as a holder or nonholder in due course.[6] This is in accord with the purpose of a cashier's check, that is, to avoid the litigation costs entailed in obtaining payment. If a payee or endorsee's right to payment upon presentment is dependent upon whether it is a holder or nonholder in due course, there would be no reason to distinguish cashier's checks from ordinary negotiable instruments. Because the payee or endorsee has the burden of establishing its holder in due course status under section 3-307, any approach that permits a bank to refuse payment on its cashier's check based on the status of the holder may force the payee or endorsee to incur litigation to obtain payment on the check. This would undermine the very foundation of a cashier's check and disregard the special characteristics attributable to cashier's checks. Accordingly, we decline to adopt the note theory approach as it applies to cashier's checks.
*200 We also reject the rationale of the First District Court of Appeal in its opinion in this case. Under that rationale, when a cashier's check is endorsed to a holder other than the original payee, it becomes entangled in other transactions and the parties place less reliance on the check as the equivalent of cash. Barnett Bank v. Warren Finance, Inc., 532 So.2d at 680. Therefore, the district court reasoned that the check became more like an ordinary negotiable instrument than a cashier's check and, thus, applied the note theory approach and determined the defenses which the bank may assert based on the status of the holder of the cashier's check.
We disagree with the district court's approach. We reiterate that a bank's duty to pay its cashier's check when presented for payment should not depend upon whether the presenter of the check is a holder in due course. Further, a cashier's check does not lose its cash-like attributes merely because it has been endorsed by the original payee and negotiated to another party. The district court cites no authority for this proposition nor can any be discovered.[7]
The district court's reliance on Leo Syntax Auto Sales, Inc. v. Peoples Bank & Savings Co., 6 Ohio Misc. 226, 35 Ohio O.2d 330, 215 N.E.2d 68 (1965), is also misplaced. In that case, the payee of a cashier's check endorsed the check in payment for a car. The payee then discovered the car not to be in the condition represented and requested the bank to refuse payment. The court held that a bank could refuse to pay a holder of its cashier's check based on the request of the payee of the check when presented by one not a holder in due course or by one who obtained the endorsement by fraud. The court in Leo Syntax recognized the common law general rule that, once issued, a cashier's check was not subject to countermand. It held, however, that when the payee also purchased the check, and the bank in its discretion refused payment at the request of the purchaser/payee, then the general rule did not apply and the bank should be permitted to dishonor its cashier's check without incurring liability.
The district court's reliance on Leo Syntax is untenable. Even if the exception carved out by the Ohio court were valid, it would not apply to the case on hand. Redan as payee was not also the purchaser of the cashier's checks. Moreover, banks cannot be permitted to refuse payment on their cashier's checks at their discretion. Such a holding is contrary to the common usage and function of cashier's checks, and in conflict with the majority of court decisions involving cashier's checks. Banks should not act as arbiters between disputing parties over ownership of a cashier's check issued by that bank. Such a rule is as much for the banks' own protection as it is for the preservation of the cash-like attributes of cashier's checks.
The difficulties which courts have incurred in determining the rights of parties to a cashier's check are due in part to the fact that the UCC contains no specific provisions regarding the respective rights and liabilities of the parties involved in its formation. See Fox, Stopping Payment on a Cashier's Check, 19 B.C.L.Rev. 683 (1978); Note, Bossuyt v. Osage Farmers National Bank: Cashier's Checks Under the Iowa Uniform Commercial Code, 73 Iowa L.Rev. 521, 524 (1988). Due to the lack of governing provisions, courts which have adopted either the cash equivalent or note approach have focused on the effect of a cashier's check to begin their analysis.
Instead, as previously stated, we choose to focus upon the purpose and use of a cashier's check, rather than the effect, to determine the respective rights and liabilities of parties to that check. The UCC states in section 1-103 that unless displaced by the particular provisions of the Code, the principles of law and equity shall supplement its provisions. Further, subsection *201 1-102(1) expressly states that the Code "shall be liberally construed and applied to promote its underlying purposes and policies." One such underlying purpose and policy is "to permit the continued expansion of commercial practices through custom and usage and agreement of the parties." U.C.C. § 1-102(2)(b) (1987).
In accordance with common commercial practice and the use of a cashier's check as a cash substitute, any defenses which a bank may assert to avoid payment must be narrowly limited. A rule that would absolutely forbid a bank's refusing to pay the holder of its cashier's check, however, would be inordinate. Therefore, we hold that upon presentment for payment by a holder, a bank may only assert its real and personal defenses in order to refuse payment on a cashier's check issued by the bank.[8] It may not, however, rely on a third party's defenses to refuse payment. The only inquiry a bank may make upon presentment of a cashier's check is whether or not the payee or endorsee is in fact a legitimate holder, i.e., whether the cashier's check is being presented by a thief or one who simply found a lost check, or whether the check has been materially altered. See Parker v. Dudley, 527 So.2d 240 (Fla. 5th DCA), review denied, 536 So.2d 243 (Fla. 1988). This approach maintains the validity and use of cashier's checks yet acknowledges the valid concerns of banks.
In the case at hand, when Warren deposited the cashier's checks in its account, it became entitled to payment. Warren was a legitimate holder, and Barnett had no real or personal defenses to assert against Warren's claim for payment. Thus, Barnett wrongfully dishonored its own obligation and is liable for payment.
Warren need not prove its holder in due course status because, upon presentment, the bank had no real or personal defenses to assert. This result is in keeping with the purpose and common use of cashier's checks and maintains the continuing validity of such checks. We therefore quash the district court decision and order that court to reinstate the decision of the trial court.
It is so ordered.
EHRLICH, C.J., and OVERTON, BARKETT, GRIMES and KOGAN, JJ., concur.
SHAW, J., concurs specially with an opinion.
SHAW, Justice, specially concurring.
I agree with the result reached by the majority, but I would adopt the cash-equivalent theory. The hybrid theory adopted by the majority, in my opinion, serves neither the banking public nor the banks well, and if it is to be the law of Florida, the legislature is uniquely suited to address it through amendments to the Uniform Commercial Code provisions of the Florida Statutes.
As Professor Lawrence notes:
The Uniform Commercial Code must provide a framework in which business transactions can be carried out in a cost-effective manner. Moreover, the rules governing negotiable instruments should reflect careful value judgments regarding the most desirable role for each particular instrument, and should precisely define the rights and liabilities of the parties to the various types of checks and notes that circulate in our economy. Articles 3 and 4 [of the Uniform Commercial Code] fail to offer the comprehensive framework that the modern business community needs. The provisions of these articles too often treat negotiable instruments as a homogeneous group and fail to recognize the peculiar functions that our economy has assigned each separate instrument. This failure is most apparent with regard to the Code's treatment of bank checks.
Bank checks can potentially serve two important functions in the economy. Primarily, bank checks can be utilized as cash substitutes, offering the finality of *202 payment in cash while at the same time insulating the transacting parties from the risk of loss. Additionally, bank checks can serve as the personal checks of banks. The Uniform Commercial Code totally ignores these two distinct roles of bank checks and therefore should be revised.
Since it is impossible for a single instrument to serve the conflicting roles of cash equivalent and personal check, the Code should explicitly assign only one role to each instrument. Cashier's checks should be clearly defined as cash equivalents, and teller's checks should continue to serve as the personal checks of banks. Certified checks, already obsolescent because of problems in processing, should be phased out of use altogether. Such revisions would lend more certainty to transactions involving commercial paper and would rationalize the functions of the bewildering variety of negotiable instruments that are available for use in modern commercial transactions.
Lawrence, Making Cashier's Checks and Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code, 64 Minn. L.Rev. 275, 339-40 (1980).
Furthermore, I prefer not to answer questions not asked. We were asked essentially whether third-party defenses were available to the bank. The majority correctly concludes that third-party defenses are not available to a bank issuing a cashier's check, but the opinion then gratuitously offers that some defenses, real to the bank, may be asserted by the bank to avoid liability  a question not before us today. We should refrain from speculating upon that question until such time as an actual controversy sharpens the issue for us.
NOTES
[1] U.C.C. § 4-303 (1987) provides in part:

When Items Subject to Notice, Stop-Order, Legal Process or Setoff; Order in Which Items May Be Charged or Certified.
(1) Any knowledge, notice or stop order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:
(a) accepted or certified the item;
[2] Florida has adopted the provisions of the Uniform Commercial Code by statute in chapters 671-680, Florida Statutes (1987). We will refer to the UCC provisions, however, for clarity and convenience due to the different jurisdictions cited in this opinion.
[3] U.C.C. § 3-305 (1987) reads as follows:

Rights of a Holder in Due Course.
To the extent that a holder is a holder in due course he takes the instrument free from
(1) all claims to it on the part of any person; and
(2) all defenses of any party to the instrument with whom the holder has not dealt except
(a) infancy, to the extent that it is a defense to a simple contract; and
(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and
(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and
(d) discharge in insolvency proceedings; and
(e) any other discharge of which the holder has notice when he takes the instrument.
[4] U.C.C. § 3-306 (1987) provides as follows:

Rights of One Not Holder in Due Course.
Unless he has the rights of a holder in due course any person takes the instrument subject to
(a) all valid claims to it on the part of any person; and
(b) all defenses of any party which would be available in an action on a simple contract; and
(c) the defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose (Section 3-408); and
(d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party.
[5] Besides, Barnett's reasoning is contrary to the express wording of subsection 3-306(4). The language in subsection (4) which Barnett argues supports its position states that "[t]he claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party." Barnett argues that Redan's actions in making an appearance before the trial court and filing an answer and affirmative defenses against Warren fulfills the requirements of subsection (4) and thus should allow Barnett to assert Redan's fraud claim as a defense against liability to Warren. If Redan is defending the action for Barnett, however, then it should be Redan which is permitted to assert its fraud claim on Barnett's behalf and not Barnett asserting Redan's fraud claim on Barnett's own behalf, as Barnett contends. In addition, we do not even need to consider whether Redan's actions satisfy the requirements of subsection 3-306(4) because, by issuing a cashier's check, Barnett has incurred an independent obligation to Warren. See Louis Falcigno Enterprises, Inc. v. Massachusetts Bank & Trust Co., 14 Mass. App. 92, 436 N.E.2d 993 (1982).
[6] U.C.C. § 3-302 (1987) provides as follows:

Holder in due course.
(1) A holder in due course is a holder who takes the instrument:
(a) for value; and
(b) in good faith; and
(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
(2) A payee may be a holder in due course.
(3) A holder does not become a holder in due course of an instrument:
(a) by purchase of it at judicial sale or by taking it under legal process; or
(b) by acquiring it in taking over an estate; or
(c) by purchasing it as part of a bulk transaction not in the regular course of business of the transferor.
(4) A purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased.
[7] The rationale of the district court has been criticized as not justified by case law, the language of the UCC, or by sound notions of public policy, and is cited as illustrative of the confusion into which courts sometimes fall in the area of determining the respective rights of parties to a cashier's check. B. Clark, The Law of Bank Deposits, Collections and Credit Cards 2.6[3][b] (1st ed. Cumm.Supp. 1989).
[8] U.C.C. § 1-201(20) reads as follows:

"Holder" means a person who is in possession of a document of title or an instrument or a certificated investment security drawn, issued, or indorsed to him or his order or to bearer or in blank.