(No. 106804.—

MIDAMERICA BANK, FSB, Appellant, v. CHARTER ONE BANK, FSB, *et al.*, Appellees.

*Opinion filed March 19, 2009.*

Patrick J. Williams and Vincent C. Mancini, of Ekl Williams, PLLC, of Lisle, for appellant.

Richard J. Nogal and Christopher J. Novak, of Goldstein, Skrodzki, Russian, Nemec & Hoff, Ltd., of Burr Ridge, for appellees.

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

In this appeal, we consider: (1) whether a bank may issue a stop-payment order on a cashier's check under the Illinois Uniform Commercial Code (810 ILCS 5/1—101 *et seq.* (West 2002)); and (2) whether the circuit court of Du Page County erred in denying MidAmerica loss of interest and attorney fee expenses under the UCC. The circuit court held that a cashier's check is the equivalent of currency and that Charter One must, therefore, honor its cashier's check but declined to award MidAmerica loss of interest and attorney fees. The appellate court reversed the circuit court's holding that Charter One must honor its cashier's check, and affirmed the circuit court's decision not to award loss of interest and attorney fee expenses to MidAmerica. 383 Ill. App. 3d 243. We allowed MidAmerica's petition for leave to appeal (210 Ill. 2d R. 315). We reverse the appellate court's judgment and remand the cause to the appellate court with directions.

### I. BACKGROUND

In 2002, Mary Christelle, the mother of David Hernandez (president of Essential Technologies of Illinois (ETI)), purchased a $50,000 cashier's check from Charter One payable to ETI with funds from her Charter One account. ETI deposited the check in its MidAmerica ac-

count. Four days later, Christelle asked Charter One to stop payment on the check. Charter One issued a stop-payment order on the cashier's check, and it then refused to honor the check when MidAmerica presented it for payment, returning it to MidAmerica stamped "stop payment." MidAmerica sent the check to ETI after removing $50,000 from ETI's account. Within two weeks, ETI's account dropped to approximately a negative $52,000.

In 2006, MidAmerica filed suit against Charter One to recover the value of the check. MidAmerica alleged that Charter One wrongfully stopped payment on the cashier's check in violation of section 3—411 of the UCC (810 ILCS 5/3—411 (West 2002)). MidAmerica sought $50,000 plus interest from January 24, 2002, attorney fees, and costs of suit.

Charter One answered the complaint, admitting that it issued a stop-payment order on the cashier's check and that MidAmerica made demands for payment. Charter One also filed affirmative defenses, alleging the cashier's check was issued in furtherance of a fraudulent scheme or by mistake. Charter One then filed a third-party complaint seeking damages against Christelle, Hernandez and his wife, and ETI.

At trial, a MidAmerica employee testified that she first learned of the ETI account in January 2002, when a $50,000 personal check was deposited to ETI's MidAmerica account and returned for insufficient funds. Subsequently, $50,000 was redeposited to ETI's account by the cashier's check issued by Charter One payable to ETI. The cashier's check was then processed through Charter One for payment. On January 24, 2002, the cashier's check was returned to MidAmerica with a stop-payment order placed on it. MidAmerica debited ETI's bank account $50,000 and held the cashier's check until the account reached a positive balance, when the cashier's check was returned to ETI as the payee. Ultimately,

ETI's account was closed due to a negative balance after additional deposited checks were returned for insufficient funds. During the investigation of ETI's bank account, MidAmerica found no evidence of any fraudulent ETI scheme.

A security officer for Charter One testified that she investigated the cashier's check in April or May 2002. She stated that Charter One permits stop-payment orders to issue on a cashier's check only if the check is lost, destroyed or stolen, and that bank policy permits it to seek indemnification from the person who placed the stop-payment order. The bank also requires an affidavit to support the stop-payment order, but Charter One could not locate an affidavit in this case. According to the security officer, Christelle's account contained sufficient funds to cover the cashier's check upon issuance. She was unable to determine that ETI was directly involved in the issuance of the cashier's check or that ETI caused Christelle to purchase the cashier's check. Christelle's request was the only basis for the stop-payment order. At the time of the stop-payment order, there was no shortage in Christelle's account, nor was there any evidence of fraud.

At the conclusion of trial, MidAmerica submitted an affidavit supporting its claimed attorney fees of $33,731.25, plus the costs of suit. In its written closing argument, MidAmerica also sought interest from January 22, 2002.

The circuit court ruled in favor of MidAmerica, awarding it $50,000 plus costs. The circuit court, however, denied MidAmerica's request for loss of interest and attorney fee expenses.

The appellate court affirmed the circuit court's decision not to award attorney fees to MidAmerica but reversed its holding that MidAmerica could enforce the cashier's check against Charter One. We allowed

MidAmerica's petition for leave to appeal (210 Ill. 2d R. 315).

## II. ANALYSIS

In this appeal, we consider: (1) whether a bank may issue a stop-payment order on a cashier's check under the Illinois Uniform Commercial Code (810 ILCS 5/1— 101 *et seq.* (West 2002)); and (2) whether the circuit court erred in denying MidAmerica loss of interest and attorney fees. We first consider the stop-payment issue.

### A. Stop-payment Orders on Cashier's Checks

MidAmerica asserts that the UCC does not permit stop-payment orders on cashier's checks. Charter One counters that the UCC entitled it to dishonor the cashier's check because the check was procured by fraud. The parties agree that the pertinent facts of this case are uncontroverted. Accordingly, the issue on appeal is limited to application of the law to the undisputed facts and, thus, our standard of review is *de novo. City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005).

We begin our review by addressing MidAmerica's argument that stop-payment orders on cashier's checks are not permitted under the UCC. Our "primary objective *** when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). We look to the plain language of the statute as "the most reliable indication of the legislature's objectives *** and when the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation." *DeLuna*, 223 Ill. 2d at 60. When the language of a statute is ambiguous, we must construe the statute to avoid rendering any part meaningless or superfluous. *People v. Jones*, 214 Ill. 2d 187, 193 (2005). We do not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the

legislature's expressed intent. *People v. Martinez*, 184 Ill. 2d 547, 550 (1998).

Section 4—403(a) of the UCC addresses a customer's right to stop payment on checks, as follows:

"(a) A customer or any person authorized to draw on the account if there is more than one person may stop payment of any item drawn *on the customer's account* or close the account by an order to the bank describing the item or account with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it before any action by the bank with respect to the item described in Section 4—303." (Emphasis added.) 810 ILCS 5/4—403(a) (West 2002).

A cashier's check is an item drawn on the issuing bank. See 810 ILCS 5/3—104(g) (West 2002) (" 'Cashier's check' means a draft with respect to which the drawer and drawee are the same bank or branches of the same bank"). Thus, a cashier's check is not an item drawn on the customer's account. The plain language of section 4—403 permits a customer to stop payment only on items drawn "on the customer's account." It does not authorize a bank to stop payment on a cashier's check at a customer's request because cashier's checks are not drawn "on the customer's account."

Our interpretation of section 4—403 is supported by UCC comment 4 to section 4—403, stating:

"4. A cashier's check or teller's check purchased by a customer whose account is debited in payment for the check is not a check drawn on the customer's account within the meaning of subsection (a); hence, a customer purchasing a cashier's check or teller's check has no right to stop payment of such a check under subsection (a). If a bank issuing a cashier's check or teller's check refuses to pay the check as an accommodation to its customer or for other reasons, its liability on the check is governed by Section 3—411. There is no right to stop payment after certification of a check or other acceptance of a draft, and this is true no matter who procures the certification. See Sections 3—411 and 4—303. The acceptance is the drawee's

own engagement to pay, and is not required to impair its credit by refusing payment for the convenience of the drawer." 810 ILCS Ann. 5/4—403, Uniform Commercial Code Comment 4, at 413 (Smith-Hurd 1993).

As indicated by UCC comment 4 to section 4—403, by refusing to pay the cashier's check as an accommodation to Christelle, Charter One's liability on the check is governed by section 3—411 of the UCC.

Section 3—411 of the UCC, in turn, provides for liability of a bank that refuses to pay its issued cashier's check:

"(a) In this Section, 'obligated bank' means the acceptor of a certified check or the issuer of a cashier's check or teller's check bought from the issuer.

(b) If the obligated bank wrongfully (i) refuses to pay a cashier's check or certified check, (ii) stops payment of a teller's check, or (iii) refuses to pay a dishonored teller's check, the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment and may recover consequential damages if the obligated bank refuses to pay after receiving notice of particular circumstances giving rise to the damages.

(c) Expenses or consequential damages under subsection (b) are not recoverable if the refusal of the obligated bank to pay occurs because (i) the bank suspends payments, (ii) the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument, (iii) the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument, or (iv) payment is prohibited by law." 810 ILCS 5/3—411 (West 2002).

Reading the plain language of sections 4—403 and 3—411 together leads us to one unmistakable conclusion: a bank's refusal to pay a cashier's check based on its customer's request to stop payment is "wrongful" under section 3—411 because a customer has no right to stop payment on a cashier's check under section 4—403. Further, UCC comment 1 to section 3—411 states:

"A [customer] using [cashier's checks or teller's checks] has no right to stop payment. Nevertheless, some banks will refuse payment as an accommodation to a customer. Section 3—411 is designed to discourage this practice." 810 ILCS Ann. 5/3—411, Uniform Commercial Code Comment 1, at 238-39 (Smith-Hurd 1993).

UCC comment 1 to section 3—411 explains that the dishonor of a cashier's check at a customer's request to stop payment is a wrongful refusal to pay subject to liability under section 3—411. Thus, we agree with MidAmerica that by accepting Christelle's request to stop payment on the cashier's check issued by Charter One, and then refusing payment based solely on that request, Charter One wrongfully dishonored the cashier's check and is, therefore, liable under section 3—411.

Our interpretation of the UCC is also consistent with this court's prior holding in *Gillespie v. Riley Management Corp.*, 59 Ill. 2d 211 (1974). In *Gillespie*, this court determined that the purchaser of a cashier's check retains the right to cancel the cashier's check until the purchaser delivers or negotiates the check to the payee. *Gillespie*, 59 Ill. 2d at 217. We explained that "[o]ne acquires a cashier's check for the purpose of assuring the payee that there are the necessary funds contemplated by a transaction, and that the check, like the money it represents, cannot be countermanded or revoked after the payee has received it." *Gillespie*, 59 Ill. 2d at 218. Thus, we held that the purchaser of a cashier's check has the right to cancel the check by surrendering it to the issuing bank until the check enters the stream of commerce. *Gillespie*, 59 Ill. 2d at 218.

Here, Charter One issued the cashier's check at the request of Christelle. Christelle then delivered the cashier's check to ETI, who deposited the cashier's check in its MidAmerica account. The cashier's check entered the stream of commerce when Christelle delivered it to ETI. Applying the holding in *Gillespie* to the facts of this

case, Christelle had no right to stop payment on the cashier's check after she delivered the check to ETI.

Our appellate court has similarly held that a stop-payment order is ineffective based on the express language of the UCC. See *Able & Associates, Inc. v. Orchard Hill Farms of Illinois, Inc.*, 77 Ill. App. 3d 375 (1979). Relying in part on this court's holding in *Gillespie*, *Able* held that a bank has no right to stop payment on cashier's checks because they are the equivalent of cash. *Able*, 77 Ill. App. 3d at 381-82. Particularly persuasive is *Able*'s explanation of the "policy considerations" requiring a rule prohibiting banks from refusing to honor their cashier's checks:

" 'A cashier's check circulates in the commercial world as the equivalent of cash. [Citation.] People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. In effect, the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it into cash.' " *Able*, 77 Ill. App. 3d at 382, quoting *National Newark & Essex Bank v. Giordano*, 111 N.J. Super. 347, 351-52, 268 A.2d 327, 329 (1970).

Thus, prior court precedent supports our interpretation of the UCC's treatment of cashier's checks as the equivalent of cash.

Charter One, however, points out that article 3 of the UCC was revised by Public Act 87—582 in 1992. See Pub. Act 87—582, §1, eff. January 1, 1992. Charter One submits that the 1992 revisions changed the law from treating cashier's checks as "cash equivalents" to treat-

ing them as "demand notes." Charter One argues that all defenses to the enforcement of a note now apply to cashier's checks. Specifically, Charter One relies on the language of section 3—412 of the UCC (810 ILCS 5/3—412 (West 2002)). MidAmerica, on the other hand, argues that although section 3—412 was rewritten in 1992, the changes were not intended to change the treatment of cashier's checks as "cash equivalents." Rather, the revision merely allows a bank to dishonor a cashier's check under very limited circumstances, and none of those circumstances apply here.

Section 3—412 states:

"Obligation of issuer of note or cashier's check. The issuer of a note or cashier's check or other draft drawn on the drawer is obligated to pay the instrument (i) according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder, or (ii) if the issuer signed an incomplete instrument, according to its terms when completed, to the extent stated in Sections 3—115 and 3—104. The obligation is owed to a person entitled to enforce the instrument or to an indorser who paid the instrument under Section 3—415." 810 ILCS 3—412 (West 2002).

Given the plain language of the statute, we are unable to ascertain whether the legislature intended cashier's checks to be treated as "cash equivalents" or "demand notes." Again, our primary objective in construing section 3—412 is to give effect to the legislature's intent. *DeLuna*, 223 Ill. 2d at 59. This court has looked to the UCC comment explanations in discerning legislative intent. See *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 87 (2006); *Brandt v. Boston Scientific Corp.*, 204 Ill. 2d 640, 647 (2003). In determining the legislative intent of section 3—412, we find UCC comment 1 instructive:

"1. The obligations of the maker, acceptor, drawer, and indorser are stated in four separate sections. Section 3—412 states the obligation of the maker of a note and is

consistent with former Section 3—413(1). Section 3—412 also applies to the issuer of a cashier's check or other draft drawn on the drawer. Under former Section 3—118(a), since a cashier's check or other draft drawn on the drawer was 'effective as a note,' the drawer was liable under former Section 3—413(1) as a maker. Under Sections 3—103(a)(6) and 3—104(f) a cashier's check or other draft drawn on the drawer is treated as a draft to reflect common commercial usage, but the liability of the drawer is stated by Section 3—412 as being the same as that of the maker of a note rather than that of the drawer of a draft. Thus, Section 3—412 does not in substance change former law." 810 ILCS Ann. 5/3—412, Uniform Commercial Code Comment 1, at 240 (Smith-Hurd 1993).

UCC comment 1 to section 3—412 indicates that cashier's checks are treated as drafts to reflect common commercial usage, but that liability of the "drawer" is the same as the "maker" of a note. This is because a bank issuing a cashier's check is both the drawer and drawee of the check. See 810 ILCS 5/3—104(g) (West 2002) (" 'Cashier's check' means a draft with respect to which the drawer and drawee are the same bank or branches of the same bank"). The UCC provides that cashier's checks are drafts, not notes. Section 3—412 simply addresses the liability of the bank. The liability of a bank is that of the maker of a note because issuance of a cashier's check establishes the bank as both drawer and drawee, representing that it will honor the draft when presented. Thus the 1992 revisions to section 3—412 do not represent a change in the former law.

The UCC comment preceding article 3 supports our interpretation:

"Section 3—411 and related provisions considerably improve the acceptability of bank obligations like cashier's checks as *cash equivalents* by providing disincentives to wrongful dishonor, such as the possible recovery of consequential damages." (Emphasis added.) 810 ILCS Ann. art. 3, Comment B, at 8 (Smith-Hurd 1993).

The UCC comment preceding article 3 explains that

cashier's checks are to be treated as "cash equivalents." See 810 ILCS Ann. art. 3, Comment B, at 8 (Smith-Hurd 1993). We therefore reject Charter One's argument that the 1992 revisions to the UCC changed the law to treat cashier's checks as "demand notes."

Courts of other states have also held that stop-payment orders are ineffective for cashier's checks under the UCC. See *Arnold, Matheny & Eagan, P.A. v. First American Holdings, Inc.*, 982 So. 2d 628, 639 n.10 (Fla. 2008), quoting *Warren Finance, Inc. v. Barnett Bank of Jacksonville, N.A.*, 552 So. 2d 194, 197 (Fla. 1989) (recognizing that " '[n]either the bank nor a purchaser of a cashier's check from the bank has a right to "stop payment" on a cashier's check' "). See also *Flatiron Linen, Inc. v. First American State Bank*, 23 P.3d 1209, 1212 (Colo. 2001) (adopting the cash equivalency approach and noting the majority of courts "hold that a cashier's check is the equivalent of cash").

We determine that the express language of the UCC prohibits stop-payment orders on cashier's checks. Christelle's request to stop payment on the cashier's check was the only reason Charter One refused to honor payment on it. When Charter One issued the cashier's check, Christelle's account had sufficient funds. Thus, Charter One's dishonor of the cashier's check was wrongful.

Charter One, nonetheless, attempts to assert defenses to support its dishonor of the cashier's check, arguing that the cashier's check was procured by fraud. To the contrary, the record does not show that Charter One had knowledge of any fraud when it dishonored the cashier's check. Charter One simply dishonored the cashier's check based on Christelle's stop-payment request. Thus, Charter One cannot assert fraud as a defense to its wrongful dishonor of the cashier's check.

Charter One also submits that MidAmerica has no standing to enforce the cashier's check because it does

not have possession of the original check. MidAmerica admits that the original cashier's check is missing. Section 3—309 of the UCC provides that the holder of a lost, destroyed, or stolen instrument may seek to enforce the instrument. 810 ILCS 5/3—309 (West 2002). Section 3—309 states:

"(a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

(b) A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument. If that proof is made, Section 3—308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means." 810 ILCS 5/3—309 (West 2002).

MidAmerica contends section 3—309 does not impact its standing to recover the proceeds of the cashier's check because the check only became missing after it was dishonored by Charter One and returned to MidAmerica. We agree.

At the time ETI sought payment, the cashier's check was not lost, destroyed or stolen. MidAmerica introduced evidence that: (1) ETI possessed the cashier's check, entitling it to enforce the check when the loss occurred; (2) ETI did not transfer the cashier's check, nor was it

lawfully seized; (3) MidAmerica cannot locate the cashier's check; (4) MidAmerica returned the cashier's check to ETI when its account attained a positive balance; (5) ETI cannot locate the cashier's check; and (6) ETI's interest in the cashier's check was assigned to MidAmerica. MidAmerica therefore introduced sufficient evidence to establish a viable reason for its failure to produce the cashier's check at trial, meeting the requirements of section 3—309. Accordingly, MidAmerica is entitled to enforce the cashier's check.

Alternatively, Charter One contends that if we determine it wrongfully refused to pay the cashier's check, it is entitled to a setoff against MidAmerica for any liability imposed upon it for payment of the cashier's check. Charter One contends that, as assignee of the cashier's check, MidAmerica stands in the shoes of ETI and is precluded from collecting it. The trial court denied Charter One a right to a setoff, finding that Charter One did not assert its right to a setoff in the trial proceedings.

Section 2—608 of the Code of Civil Procedure provides, in relevant part:

"(a) Any claim by one or more defendants against one or more plaintiffs, or against one or more codefendants, whether in the nature of setoff, recoupment, cross claim or otherwise, and whether in tort or contract, for liquidated or unliquidated damages, or for other relief, may be pleaded as a cross claim in any action, and when so pleaded shall be called a counterclaim.

(b) the counterclaim shall be a part of the answer, and shall be designated as a counterclaim. Service of process on parties already before the court is not necessary." 735 ILCS 5/2—608 (West 2002).

Our appellate court has held that although the pleading requirements of section 2—608 are framed as permissive, a party cannot be afforded relief without a corresponding pleading. *Bartsch v. Gordon N. Plumb, Inc.*, 138 Ill. App. 3d 188, 200 (1985). A defendant is required to raise a claim for a setoff in the pleadings to give the

plaintiff notice and an opportunity to defend against the claim. See *Vieweg v. Friedman*, 173 Ill. App. 3d 471, 474 (1988), citing *Mayfield v. Swafford*, 106 Ill. App. 3d 610, 612 (1982).

An examination of Charter One's pleadings reveals that it did not claim any right to a setoff. The first mention of a setoff appears in Charter One's written closing argument to the trial court. MidAmerica did not have notice or opportunity to defend against Charter One's setoff claim. Under these circumstances, we find that the trial court did not err in denying Charter One's late request for a setoff. Next we examine whether MidAmerica is entitled to loss of interest and attorney fees.

B. Loss of Interest and Attorney Fees

MidAmerica contends that the circuit court erred in denying its request to collect loss of interest and attorney fees under section 3—411 of the UCC (810 ILCS 5/3—411(b) (West 2002)). Charter One's brief before this court did not address this issue.

The appellate court did not reach this issue because it held that MidAmerica could not enforce the cashier's check against Charter One. We therefore remand this cause with directions for the appellate court to address whether the circuit court erred in denying MidAmerica loss of interest and attorney fees under section 3—411(b).

III. CONCLUSION

We hold that Charter One wrongfully dishonored the cashier's check it issued at Christelle's request. We therefore reverse the judgment of the appellate court and remand this cause to the appellate court to address whether the circuit court erred in denying MidAmerica's request for loss of interest and attorney fees.

*Reversed and remanded with directions.*