# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Ponto v. Levan*, 2012 IL App (2d) 110355

---

| | |
|---|---|
| Appellate Court Caption | DENISE PONTO, Plaintiff-Appellant and Cross-Appellee, v. DALE LEVAN, Defendant and Third-Party Plaintiff-Appellant and Cross-Appellee (The City of Dixon, Third-Party Defendant-Appellee and Cross-Appellant). |
| District & No. | Second District<br>Docket No. 2-11-0355 |
| Filed | June 27, 2012 |
| Modified upon denial of rehearing | August 8, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The expiration of the one-year statute of limitations in the Tort Immunity Act barred plaintiff from adding third-party defendant city as a defendant in her action against an intoxicated driver who slid on a patch of ice caused by the city's negligently maintained water main and struck her car, and with regard to defendant driver's timely third-party complaint against the city, the city was not entitled to assert immunity for the discretionary acts of its employees under the Act because no discretion was exercised in connection with the water main at the site of the accident. |
| Decision Under Review | Appeal from the Circuit Court of Lee County, No. 08-L-9; the Hon. Daniel A. Fish, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

David J. Brassfield and Erik E. Carlson, both of Brassfield, Krueger & Ramlow, Ltd., of Rockford, for appellant Denise Ponto.

Esther Joy Schwartz, Theodore W. Pannkoke, Richard W. Schumacher, and Mark A. Huske, all of Stellato & Schwartz, Ltd., of Chicago, for appellant Dale Levan.

Stephen E. Balogh and Laura D. Mruk, both of WilliamsMcCarthy LLP, of Rockford, for appellee.

Panel

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices Zenoff and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1 Following an automobile accident, plaintiff, Denise Ponto, sued defendant and third-party plaintiff, Dale Levan, alleging negligence, including that Levan drove while intoxicated. Levan filed a counterclaim for contribution against third-party defendant, the City of Dixon (City), alleging that the City's negligent maintenance of its water mains created an ice patch that caused Levan's automobile to skid into Ponto's vehicle. Levan admitted liability, and a jury found in Ponto's favor, awarding her $585,174.23 in damages and finding Levan 65% at fault and the City 35% at fault. The trial court entered judgment on the verdict and found that Levan was not entitled to contribution unless he paid more than his *pro rata* share of the damages. Ponto and Levan separately appeal, and the City cross-appeals.

¶ 2 Generally, Ponto and Levan argue that Ponto should be allowed to collect the balance of her verdict against Levan from the City, and, in its cross-appeal, the City argues that it should have been allowed to assert the affirmative defense of discretionary immunity. The parties specifically ask us to determine whether: (1) under section 2-406 of the Code of Civil Procedure (Code) (735 ILCS 5/2-406 (West 2008)), the trial court erred in denying Ponto leave to amend her complaint to add the City as a *direct* defendant more than two years after she commenced her suit against Levan, when the third-party action against the City had been commenced within the one-year statute of limitations contained in the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/8-101 (West 2008)); (2) a third-party defendant who is more than 25% at fault may be jointly and severally liable to the plaintiff under section 2-1117 of the Code (735 ILCS 5/2-1117 (West 2008)); (3) the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 2008)) permits a third-party defendant to be shielded from judgment unless and

-2-

until a third-party plaintiff has paid more than his *pro rata* share of the judgment; and (4) the trial court improperly precluded the City from asserting immunity for the alleged discretionary acts of its employees. For the following reasons, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4        On February 2, 2008, at about 2:30 a.m., Ponto was driving south on River Road (Illinois Route 2) in Dixon. Levan was driving his truck north. Levan's truck slid into the southbound lanes of traffic and collided with Ponto's vehicle. Ponto sustained injuries. Levan was not injured, but he was subsequently charged with operating his vehicle while intoxicated.

¶ 5        On February 29, 2008, Ponto sued Levan,[1] alleging negligence and willful and wanton misconduct. Levan denied the allegations. On February 26, 2009, Levan filed a third-party complaint against the City, seeking contribution under the Contribution Act. Levan claimed that, as he was driving downhill, around a curve, and onto River Road from the south, he encountered a patch of ice created by a leaking municipal water main under the road. He argued that the City failed to maintain the streets in a reasonably safe condition and that the City had constructive notice of the particular defect–a leaking water main near 920 East River Road, near the accident site–because of prior leaks under the road, some in close proximity to the February 2, 2008, leak. Levan also argued that the road's condition was unreasonably dangerous and that prior water main leaks in the area put the City on notice that additional leaks could occur.

¶ 6        On June 16, 2009, the City moved to dismiss (735 ILCS 5/2-619(a)(9) (West 2008)), arguing first that it had no notice of the water main break until after the collision and, second, that discretionary immunity under section 2-201 of the Tort Immunity Act applied because it had approved a plan (*i.e.*, an alleged discretionary act) to replace the water main at this location.

¶ 7        On November 13, 2009, the trial court denied the City's motion, finding that the questions whether the City lacked notice and whether the City's water department superintendent was exercising discretion constituted factual questions for the jury.

¶ 8        On June 15, 2010, Ponto moved for leave to file a second amended complaint to add the City as a defendant, seeking to argue that the City's negligent maintenance of its water mains resulted in an icy patch that caused the accident. She maintained that no prejudice would result, because the allegations in her complaint were identical to those in Levan's third-party complaint. In response, the City raised the Tort Immunity Act's one-year statute of limitations. The trial court, on August 23, 2010, denied Ponto's motion, finding that section 2-406 of the Code (735 ILCS 5/2-406 (West 2008)), which permits the addition of third-party defendants, does not state that the statute of limitations is tolled for purposes of adding as a codefendant to a plaintiff's claim a third-party defendant.

¶ 9        Prior to trial, Levan filed an amended answer to Ponto's complaint, admitting liability.

_____

[1]She also sued Dennis Levan, the vehicle's owner and Dale's father. Subsequently, the cause against Dennis was dismissed with prejudice.

A jury trial commenced on November 15, 2010. Because some of the testimony relates to the third issue on appeal (*i.e.*, application of the Tort Immunity Act), we briefly summarize it.

¶ 10    Levan testified that he was intoxicated on the day of the collision and that he was at least partly at fault for the accident. Several witnesses testified that on the roadway near the accident site there was water and ice that came from a water main break. It was undisputed that there was a leak in the water main under Route 2 near the location where Ravine Avenue and East River Street meet and become River Road/Route 2. The accident occurred near 920 East River Road. Water from the leak was percolating through the road surface, causing a freezing puddle about 10 feet across. Ponto's theory as to the City was that the municipality should have replaced the entire water main pipe (*i.e.*, the River Street *and* River Road portions) near the collision site.

¶ 11    Willard "Rusty" Cox, the City's water department superintendent, testified that he oversees the City's water distribution system under the supervision of the director of public works, Shawn Ortgiesen. Cox explained that he has a choice in how he maintains the City's water distribution system and considers competing interests such as cost, public safety, and public convenience. Between 2006 and 2008, there had been nine water main breaks in the area (from 400 East River Street to 920 East River Road), including one on October 26, 2007, that was 8 to 12 feet from the break that occurred at 920 East River Road on the day of the collision. The City did not have in place any inspection system.

¶ 12    Cox further testified that the River Street and River Road projects were two discrete projects. Based on the number of breaks, the City determined that the River Street water line was faulty. On December 3, 2007, the City entered into an engineering agreement to replace the pipe (only) on River Street (from Bunny's Bait Shop to Crawford Avenue). (Before entering into the agreement, no study was performed for either the River Street or the River Road project.) A new pumping station near the collision site came on line in 2006. There were no recurring leaks in the area prior to the new station. In March 2008, the River Street portion of the pipe (between Bunny's Bait Shop and Artesian Avenue) was shut down, but the River Road portion was not shut down. The project was not urgent after the main was shut off. The 2,000-foot River Street project ultimately took 18 months to complete instead of 5 months because it was not urgent, Environmental Protection Agency approval was not immediate, and there were issues with certain easements along a railroad right of way.

¶ 13    The River Road project was not included in the December 3, 2007, agreement, because Cox did not believe there was an issue with the main there; he "didn't think we had a problem," because there were no red flags before February 2008. The February 2, 2008, leak near 920 East River Road occurred about 250 feet east of Bunny's Bait Shop. Cox suspected that a water hammer following a nearby fire caused an October 2007 leak on River Road. Cox did not determine that the water main was faulty. It was not until Ponto's accident that it occurred to Cox that there might be recurring issues with the River Road main; thus, he started taking action later that year. In Cox's view, it takes four or five breaks before a call for an evaluation is made to an engineering firm. At the time of Ponto's accident, Cox did not believe that there was a "big enough problem" such that the River Road main required replacement. He and Ortgiesen decided in March or April 2008 that they needed to start budgeting for that River Road pipe's replacement. They also started the process of obtaining

an engineering agreement. The second engineering agreement (*i.e.*, for the River Road project) was executed on November 3, 2008. That project was completed in just over one year and cost $160,000. (The department's 2008 budget was $1.8 million.)

¶ 14     Before the collision, Cox knew that the River Street pipe was in bad shape. Cox further testified that he started becoming concerned about the River Road pipe in March 2008. However, he testified at his deposition that he became concerned about the series of leaks in September 2008. At trial, he explained that he became very concerned in September 2008, but had been concerned earlier that year. Cox testified that, had he conducted inspections in 2006 and 2007 and discovered that the River Road water main was in bad shape, he would have recommended to the City to have it replaced.

¶ 15     David Jacobson, an engineer and engineering consultant, testified as Levan's expert witness. He opined that the City knew or should have known that the water main under River Road/Route 2, as well as that under East River Street, should have been replaced and that it should have commissioned a study earlier than it did. The pipe was over 100 years old and made of cast iron, which made it susceptible to corrosion from salt applied to the road above it. These factors, plus the fact that the pipe had a few breaks in a confined area, were warning signs that more breaks would occur. The specific underlying causes of the breaks were the pipe's age and corrosion. After the third water main break, the City should have commissioned a study of the pipe; testing would have cost about $5,000 for a quarter-mile of pipe (and taken about a week) and a few thousand dollars more for a consultant's review. If the pipe (up to a ¾-mile length) needed to be replaced, the process would have taken about five months. Jacobson noted that the City did not ultimately commission a study, but entered into two agreements to replace the pipe (December 2007 for the River Street portion within the City limits and November 2008 for the out-of-town section/River Road portion). The first project cost between $90,000 and $100,000. The second project cost $160,000. To the extent the City has an inspection system, it focuses on the water, not the pipes. Jacobson conceded that the primary concern in a water distribution system is the delivery of safe potable water. In March 2008, Cox and Ortgiesen decided that there was a need to budget for pipe replacement. Jacobson testified that the first time that Cox thought that the water main on River Road might need replacing was after Ponto and Levin's collision.

¶ 16     Ortgiesen, the director of the City's public works department and the City engineer, addressed the process and time for replacing the water main. He testified that, typically, the process takes about five months to complete (from the time City approval is sought for the project to the time the project is constructed, assuming weather is not a factor). In 2009, the City replaced about 2,000 feet of water main in the 400 to 800 block of East River *Street* (the ends were two natural termination points and the leaks had occurred within this area). There were no leaks on River Road until October 2007. The February 2008 leak was the second leak on River Road.

¶ 17     In late 2007 or early 2008, Ortgiesen and Cox first discussed the issue of the water main breaks on River Street and investigated and ultimately ruled out a new pump house as the cause. The River Street water main replacement project was completed in 18 months, not 5 months. Engineers shut off part of the section (in March 2008) that sustained breaks; it was not servicing any residents or businesses in the area, "so we were able to hold off a little bit."

Projects are reviewed and are implemented based on the budget and other concerns, including need. Ortgiesen conceded that the budget was not the only means by which projects could be funded. Other funding sources included bond issuances; short-term loans; excess funds; and special assessments. The River Road portion of pipe that was replaced after the accident was a 1,000-foot portion, and the River Street portion was 2,000 feet long. The December 3, 2007, engineering agreement addressed only the River Street project. At that time, Ortgiesen did not have any discussions with Cox concerning whether to address the main under River Road. "We never had reason to."

¶ 18    During trial, the City moved for a directed verdict, raising its discretionary immunity defense. The trial court denied the City's motion. After the City rested its case, it renewed its motion for a directed verdict. The trial court denied the motion on November 18, 2011.

¶ 19    On November 19, 2011, the jury returned a verdict, awarding Ponto $585,123.74 in damages and apportioning fault at 65% to Levan and 35% to the City. Ponto and the City subsequently cross-briefed the issue of the City's joint and several and contribution liability. Ponto argued that the joint liability statute imposes joint and several liability for both direct and third-party defendants and that the Contribution Act, which must be applied after assessing joint and several liability, does not conflict with it. Ponto noted that Levan's automobile liability policy limit was $100,000 and that he was judgment proof beyond that amount. The City argued that the right of contribution existed only among tortfeasors and that Levan had to pay before the City's contribution obligation was triggered. It claimed that, under the Contribution Act, Ponto could recover from only a direct, not a third-party, defendant. The trial court, on January 26, 2011, agreed with the City and entered judgment such that the City's contribution responsibility was triggered "only at such time as *** Levan has paid more than his *pro rata* share of the judgment to *** Ponto and only for that amount paid to her which is in excess of his *pro rata* share of the judgment."

¶ 20    Ponto (joined by Levan) moved the court to reconsider its order denying her leave to amend her complaint to add the City as a direct defendant. She also asked that the City be held jointly and severally liable to her for 100% of the total damages or, in the alternative, that the City be held severally liable to her for 35% of the total damages. The City also filed a posttrial motion, arguing that it was immune from liability for the discretionary acts of its employees and officials. On March 30, 2011, the trial court denied the motions. Ponto and Levan appeal, and the City cross-appeals.

¶ 21                              II. ANALYSIS
¶ 22                        A. Ponto's and Levan's Appeals
¶ 23                            1. Leave to Amend
¶ 24    Ponto (joined by Levan) argues first that the trial court erred in denying her leave to amend her complaint to add the City as a (direct) defendant. The City had argued that the Tort Immunity Act's one-year statute of limitations applied and that Ponto's complaint was untimely because it was filed more than two years after the accident. The trial court denied Ponto's request, finding that the one-year limitations period applied and that section 2-406 of the Code did not extend the period. For the following reasons, we find no error with the

trial court's findings and reject Ponto's argument.

¶ 25    Amendments to pleadings are allowed on just and reasonable terms at any time before final judgment. 735 ILCS 5/2-616(a) (West 2008). Generally, the decision whether to allow an amendment to a complaint rests within the trial court's discretion, and, absent an abuse of that discretion, we will not disturb the trial court's decision. *Seitz-Partridge v. Loyola University of Chicago*, 409 Ill. App. 3d 76, 86 (2011). "In determining whether a trial court abused its discretion, we weigh the following factors: (1) whether the proposed amended complaint would cure defective pleadings; (2) whether the amendment would surprise or prejudice the opposing party; (3) whether the amendment was timely filed; and (4) whether the movant had previous opportunities to amend." *Id.* However, here, our assessment of the trial court's ruling requires us to construe several statutes. We review *de novo* questions of statutory construction. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 35 (2009).

¶ 26    Section 8-101(a) of the Tort Immunity Act provides, in relevant part, that "[n]o civil action *** may be commenced in any court against a local entity or any of its employees for an injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a) (West 2008). Section 2-406(c) of the Code states, in relevant part, that "[a]n action is commenced against a new party by the filing of an appropriate pleading or the entry of an order naming him or her a party." 735 ILCS 5/2-406(c) (West 2008). Section 2-406(b) of the Code states: "If the plaintiff desires to assert against the third-party defendant any claim which the plaintiff might have asserted against the third-party defendant had he or she been joined originally as a defendant, the plaintiff shall do so by an appropriate pleading." 735 ILCS 5/2-406(b) (West 2008).

¶ 27    Here, the accident occurred on February 2, 2008, and Ponto filed her complaint against Levan that same month, on February 29, 2008. Levan filed his contribution action against the City on February 26, 2009, which was within one year of the date he was sued and, thus, within the one-year statute of limitations in section 8-101(a) of the Tort Immunity Act. *Highland v. Bracken*, 202 Ill. App. 3d 625, 629 (1990) (for purposes of statute of limitations, cause of action accrues on the date the action was filed against the third-party plaintiff). However, Ponto did not seek to amend her complaint to add the City as a direct defendant until June 2010, more than two years after the accident.

¶ 28    Ponto raises two arguments. She argues first that, once the cause of action against the *City* commenced, the statute of limitations was tolled and the cause became a pending action. She notes that the purpose of the limitations period in the Tort Immunity Act " 'is to encourage early investigation into the claim asserted against the local government at a time when the matter is still fresh, witnesses are available, and conditions have not materially changed.' " *Tosado v. Miller*, 188 Ill. 2d 186, 194-95 (1999) (quoting *Saragusa v. City of Chicago*, 63 Ill. 2d 288, 293 (1976)). This type of "investigation permits prompt settlement of meritorious claims and allows governmental entities to plan their budgets in light of potential liabilities." *Id.* at 195. Ponto urges that this purpose would not have been defeated if she had been allowed to amend her complaint, because the City was already a party to the suit, the City already had an opportunity to conduct an early investigation, and discovery was essentially completed. Second, turning to section 2-406 of the Code, which addresses amendments of pleadings, Ponto contends that whether that statute permits a plaintiff to

assert a claim against a third-party defendant beyond the limitations period appears to be an issue of first impression. She argues that the only proper reading of section 2-406 is that the assertion of a claim against a third-party defendant is the plaintiff's right and is an issue over which the trial court has no discretion. Further, she asserts that the statute of limitations is not an issue, because it will have been satisfied when the third-party defendant was named as a new party to the suit.

¶ 29    The City responds by noting that, generally, " 'statute[s] of limitations continue[ ] to run unless tolling is authorized by statute.' " *American Airlines, Inc. v. Department of Revenue*, 402 Ill. App. 3d 579, 605 (2009) (quoting *IPF Recovery Co. v. Illinois Insurance Guaranty Fund*, 356 Ill. App. 3d 658, 665 (2005)). The City argues that section 2-406 does not trump the statute of limitations and does not contain any express language tolling the limitations period.

¶ 30    We reject Ponto's claims. First, the commencement of the third-party action did not toll the statute of limitations concerning her potential claim against the City. *Cf. Grewenig v. American Baking Co.*, 293 Ill. App. 604, 610 (1938) (generally, in a tort action, a party cannot be brought in as a defendant after the limitations period has run in his or her favor, although the action against the original defendant was commenced within the prescribed time). Ponto cites no authority suggesting otherwise. Ponto's second argument is that the only proper reading of section 2-406 of the Code is that it permits a plaintiff to assert a claim against a third-party defendant beyond the limitations period that otherwise applies to the case. This claim constitutes a contorted reading of the provision. Nowhere does the statute reference an interplay with any statute of limitations. It addresses only the action to be taken to commence a suit, including one against a third-party defendant, which must be accomplished by "an appropriate pleading." 735 ILCS 5/2-406(b), (c) (West 2008).

¶ 31    Levan points to section 2-616(d) of the Code, which provides that the statute of limitations does not bar a suit "against a person not originally named a defendant" if: (1) the limitations period had not expired when the original suit commenced; (2) "the person, within the time that the action might have been brought or the right asserted against him," received notice of the commencement of the suit, would not be prejudiced by defending the suit, and was on notice that, "but for a *mistake* concerning the identity of the proper party," the plaintiff would have sued the person; and (3) the cause of action grew out of the same transaction or occurrence. (Emphasis added.) 735 ILCS 5/2-616(d) (West 2008). Levan argues that the foregoing requirements are met here, where Ponto timely filed suit against Levan; the City knew about the suit before the one-year limitations period expired, because the parties had deposed Cox (in December 2008); the City could not have been prejudiced by defending itself against Ponto, because it had already been doing so against Levan; Levan's contribution claim put the City on notice that Ponto mistakenly omitted the City as her direct defendant; and Ponto's original suit against Levan and her attempted suit against the City are for the same accident.

¶ 32    The City does not respond to Levan's argument. We nevertheless reject it outright because there is no evidence of any mistake concerning the City's identity. See *Borchers v. Franciscan Tertiary Province of Sacred Heart, Inc.*, 2011 IL App (2d) 101257, ¶ 51 (mistake encompasses lack of knowledge concerning the identity of all persons involved in the alleged

wrongdoing).

¶ 33    In summary, the trial court did not err in denying Ponto's request to amend her complaint to add the City as a defendant.

¶ 34    2. Section 2-1117 of the Code (Joint Liability Statute) and the Contribution Act

¶ 35    Next, Ponto (joined by Levan) argues that, under section 2-1117 if the Code (the joint liability statute) and the Contribution Act, the City is jointly and severally liable for the *entire* damages award and the trial court erred in finding otherwise. The City responds that, because Ponto did not sue it, she has no judgment against it and no right to directly recover from it, regardless of its ostensible joint and several liability. The City maintains that the trial court did not err in finding that, unless and until Levan pays more than 65% of the verdict to Ponto, the City owes nothing. For the following reasons, we conclude that the trial court did not err.

¶ 36    The issues presented in this portion of the appeal involve questions of statutory interpretation. The interpretation of a statute presents a question of law subject to *de novo* review. *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 74 (2002).

¶ 37    We first review the relevant statutes. Section 2-1117 of the Code (735 ILCS 5/2-1117 (West 2008)), which addresses joint liability, modified (to a certain extent) the common-law rule of joint and several liability. *Unzicker*, 203 Ill. 2d at 70. Under the common law, a plaintiff could recover compensation from any responsible defendant for the full amount of his or her injury. *Id.* Section 2-1117, however, provides:

    "Except as provided in Section 2-1118, in actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. *Any defendant* whose fault, as determined by the trier of fact, is *less than 25*% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be *severally* liable for all other damages. *Any defendant* whose fault, as determined by the trier of fact, is *25% or greater* of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be *jointly and severally* liable for all other damages." (Emphases added.) 735 ILCS 5/2-1117 (West 2008).

¶ 38    Section 2-1117 does not set a cap on damages; rather, it merely determines "when a defendant can be held liable for the full amount of a jury's verdict and when a defendant is liable only in an amount equal to his or her percentage of fault." *Unzicker*, 203 Ill. 2d at 94. It "replaced joint and several liability with several liability with respect to nonmedical damages for those found less than 25% responsible for a plaintiff's injuries." *Id.* at 85. Stated differently, section 2-1117 provides that "independent concurring tortfeasors will be only proportionately liable for nonmedical damages when those tortfeasors' percentage of comparative responsibility is less than 25%." *Id.* at 97 (McMorrow, C.J., specially concurring). "The clear legislative intent behind section 2-1117 is that minimally responsible defendants should not have to pay entire damage awards. The legislature set the line of

minimal responsibility at less than 25%." *Id.* at 78 (majority opinion). Thus, pursuant to section 2-1117, any tortfeasor whose percentage of fault the trier of fact determined to be "less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable" for the plaintiff's nonmedical damages. 735 ILCS 5/2-1117 (West 2008). As relevant here, the statute "retains full joint and several liability for those whose percentage of fault for the plaintiff's injuries is 25% or greater." *Unzicker*, 203 Ill. 2d at 81.

¶ 39    Section 2-1117 is considered before the Contribution Act and is applied to determine liability. *Id.* at 80. Thereafter, "[a]ny defendant who pays damages in an amount greater than his or her proportionate share of fault can *** seek contribution under the Contribution Act." *Id.*

¶ 40    Turning to contribution, in *Skinner v. Reed-Prentice Division Package Machinery Co.*, 70 Ill. 2d 1, 15 (1977), the supreme court adopted the doctrine of contribution among joint tortfeasors. That decision was later codified in the Contribution Act. *Board of Trustees of Community College, District No. 508 v. Coopers & Lybrand LLP*, 296 Ill. App. 3d 538, 545-46 (1998).

¶ 41    Subsections (a) and (b) of section 2 of the Contribution Act provide:

"§ 2. Right of Contribution. (a) Except as otherwise provided in this Act, where 2 or more persons are *subject to liability in tort* arising out of the same injury to person or property, or the same wrongful death, *there is a right of contribution among them*, even though judgment has not been entered against any or all of them.

(b) The right of contribution exists only in favor of a tortfeasor *who has paid more than his pro rata share* of the common liability, and his total recovery is limited to the amount *paid by him* in excess of his pro rata share. No tortfeasor is liable to make contribution *beyond* his own pro rata share of the common liability." (Emphases added.) 740 ILCS 100/2(a), (b) (West 2008).

¶ 42    Section 3 of the Contribution Act states, in relevant part:

"§ 3. Amount of Contribution. The pro rata share of each tortfeasor shall be determined in accordance with his relative culpability. However, no person shall be required to contribute to one seeking contribution an amount greater than his pro rata share unless the obligation of one or more of the joint tortfeasors is uncollectable. In that event, the remaining tortfeasors shall share the unpaid portions of the uncollectable obligation in accordance with their pro rata liability." 740 ILCS 100/3 (West 2008).

¶ 43    Section 4 of the Contribution Act provides, in relevant part:

"§ 4. Rights of Plaintiff Unaffected. Except as provided in Section 3.5 of this Act [addressing actions against a plaintiff's employer], a plaintiff's right to recover the full amount of his judgment *from any one or more defendants subject to liability in tort* for the same injury to person or property, or for wrongful death, is not affected by the provisions of this Act." (Emphasis added.) 740 ILCS 100/4 (West 2008).

¶ 44    "[T]he Contribution Act generally does not come into play if the plaintiff collects from the defendants in accordance with the jury's assessment of their respective culpabilities."

*Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009). Rather, the statute provides a remedy for a person *who has paid more than his or her pro rata share* of the common liability by allowing him or her to seek contribution *from a fellow joint tortfeasor who has not paid his or her pro rata share* of the common liability. *Truszewski v. Outboard Motor Marine Corp.*, 292 Ill. App. 3d 558, 561 (1997).

¶ 45		Turning to the parties' arguments, Ponto (joined by Levan) argues that both Levan and the City are fully responsible for her injuries. Specifically, she contends that section 2-1117's references to "all defendants" and "Any defendant" necessarily encompass third-party defendants. 735 ILCS 5/2-1117 (West 2008) ("*all defendants* found liable are jointly and severally liable for plaintiff's *** [medical expenses]. *Any defendant* whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages." (Emphases added.)). Ponto asserts that the City, as an independent concurrent tortfeasor "whose fault, as determined by the trier of fact, is 25% or greater" (*id.*), should be included in that group of "[a]ny defendant[s]" who are jointly and severally liable for *all* damages. Ponto urges that the term "any" is broad enough to encompass all types of defendants and that the trial court erred in reading limitations (*i.e.*, the exclusion of third-party defendants) into the term. In her view, it is "undisputed" that the City was an independent concurrent tortfeasor (based, in part, on the jury's finding that both the City and Levan were liable) that tortiously contributed to her injuries and that the purpose of the joint-and-several-liability doctrine would be subverted if section 2-1117 did not apply to the City. Ponto further points to section 2-401(d) of the Code, which addresses the designation of parties and provides, in relevant part, that "*[u]nless a contrary meaning is indicated*, wherever used in this Act and in rules adopted pursuant hereto *** *the term 'defendant' includes third-party defendants* and parties against whom relief is sought by counterclaim." (Emphasis added.) 735 ILCS 5/2-401(d) (West 2008). Moreover, she contends that the specific references in section 2-1117 to "plaintiff, the defendants sued by the plaintiff, and any third party defendants" simply reflects how the jury subdivides or itemizes its attribution of total fault; it does not negate the fact that "defendants" encompasses "third-party defendants." Alternatively, Ponto argues that a third-party defendant is directly responsible for a plaintiff's injuries that it has caused. However, she concedes that the case law upon which she relies only "implicitly" supports this claim. See *Unzicker*, 203 Ill. 2d at 71 (noting in *facts* section that the trial court found the defendant and the third-party defendant each "jointly and severally liable" for the plaintiff's medical expenses); *Lilly v. Marcal Rope & Rigging, Inc.*, 289 Ill. App. 3d 1105, 1117 (1997) (noting that both the defendant and the third-party defendant "are each responsible for 100% of the plaintiff's injury" and that the "fact that the relative culpability of the defendants *vis-a-vis one another* was calculated at 90% /10% under the Contribution Act does not change the responsibility of each to the plaintiff" (emphasis in original)), *overruled on other grounds by Unzicker*, 203 Ill. 2d at 96. Finally, Ponto argues that it would be unjust to allow the City to escape liability by virtue of Levan's insolvency. She urges that the burden of the insolvent defendant (*i.e.*, Levan) would fall on her instead of on a party that caused damages (*i.e.*, the City). See *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 123 (1983) (under the Contribution

-11-

Act, "it is the defendant or defendants who must bear the burden of the insolvent or immune defendant").

¶ 46    In response, the City argues that it is a third-party defendant and that its liability arises only under the Contribution Act and only in favor of Levan, its fellow tortfeasor, not Ponto. It primarily relies on *Stephens v. McBride*, 97 Ill. 2d 515 (1983). In *Stephens*, following a vehicle collision at an intersection, a motorcyclist sued an automobile driver, alleging negligence. The defendant filed a third-party contribution complaint against the village wherein the accident occurred, alleging that it created a hazardous condition–a visual obstruction–at the corner of the intersection. On appeal from summary judgment for the village, the supreme court first addressed whether the defendant could assert a contribution claim. The supreme court determined that the Tort Immunity Act's notice provisions did not apply to an action for contribution. *Id.* at 521. The court held that the defendant was not precluded from seeking contribution under the Contribution Act by the mere fact that, when the defendant filed his third-party complaint for contribution, the plaintiff was precluded from recovering from the village (due to the plaintiff's failure to give notice to the village of his injuries, a point that was *not* disputed). *Id.* at 519-20. Although unnecessary to its decision, the court next addressed policy considerations. *Id.* at 522-25. It noted, relying on *People ex rel. Department of Transportation v. Superior Court*, 608 P.2d 673, 684 (Cal. 1980), that its conclusion would "not permit the injured plaintiff to recover indirectly from the governmental entity although he is precluded from directly recovering from it." *Stephens*, 97 Ill. 2d at 524. Further, the court noted that, whether or not the defendant could recover from the village, the plaintiff could recover from the defendant under the doctrine of joint and several liability; thus, the plaintiff gained nothing if the defendant was permitted to recover contribution from the village. *Id.* at 525.

¶ 47    Relying primarily on *Stephens*, the City argues that, unless and until Levan pays more than 65% of the verdict to Ponto, the City owes nothing. Further, if Levan cannot pay his *pro rata* share due to insolvency, Ponto has no right to recover anything (directly or indirectly) from the City. Finally, the City contends that, if Levan *does* pay more than his *pro rata* share, Ponto gains nothing because it is Levan, not Ponto, who is permitted to recover contribution from the City. The City urges that it is not a "defendant[ ] subject to liability in tort" (740 ILCS 100/4 (West 2008)) but is a third-party defendant and that its liability arises only under the Contribution Act and only in favor of Levan. The City notes that the right of contribution belongs to a fellow tortfeasor, not to the plaintiff, and that this right is inchoate until the tortfeasor has paid more than his *pro rata* share of the liability. See *Snoddy v. Teepak, Inc.*, 198 Ill. App. 3d 966, 971 (1990). It does not respond to Ponto's (and Levan's) statutory construction arguments.

¶ 48    We conclude that the trial court did not err in entering judgment such that the City's contribution responsibility was triggered only if Levan paid more than his *pro rata* share of the judgment to Ponto (and only for that amount paid to her in excess of his *pro rata* share of the judgment). Section 2-406 of the Code permits a defendant, by third-party complaint, to bring in a person not a party to the action "who is or may be liable *to him or her*." (Emphasis added.) 735 ILCS 5/2-406(b) (West 2008). Subsections (a) and (b) provide:

"(a) If a complete determination of a controversy cannot be had without the presence of

other parties, the court may direct them to be brought in. If a person, not a party, has an interest or title which the judgment may affect, the court, on application, shall direct such person to be made a party.

(b) Within the time for filing his or her answer or thereafter by leave of court, a defendant may by third-party complaint bring in as a defendant a person not a party to the action *who is or may be liable to him or her* for all or part of the plaintiff's claim against him or her. Subsequent pleadings shall be filed as in the case of a complaint and with like designation and effect. The third-party defendant may assert any defenses which he or she has to the third-party complaint or which the third-party plaintiff has to the plaintiff's claim and shall have the same right to file a counterclaim or third-party complaint as any other defendant. *If the plaintiff desires to assert against the third-party defendant any claim which the plaintiff might have asserted against the third-party defendant had he or she been joined originally as a defendant, the plaintiff shall do so by an appropriate pleading*. When a counterclaim is filed against a party, the party may in like manner proceed against third parties. Nothing herein applies to liability insurers." (Emphases added.) 735 ILCS 5/2-406(a), (b) (West 2008).

¶ 49    With section 2-406 in mind, we turn to Ponto's and Levan's construction of the joint liability statute. The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216 (2008). When the statutory language is clear and unambiguous, it must be applied as written without resort to extrinsic aids of statutory interpretation. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature. *Id.* at 565-66.

¶ 50    Ponto and Levan request that we construe section 2-1117 in a manner that conflicts with the statute's plain meaning. The plain meaning of the terms in the statute unambiguously does not support Ponto's and Levan's reading. The fact that the provision uses both the terms "defendant" and "third-party defendant" shows that the legislature did not intend that the term "defendant" encompass "third-party defendant." Section 2-401(d)'s designation of defendant to include third-party defendants does not conflict with this interpretation, because that statute contains the qualifier "[u]nless a contrary meaning is indicated." 735 ILCS 5/2-401(d) (West 2008). A contrary meaning is indicated, in our view, by the legislature's inclusion in the joint liability statute of both "defendant" and "third-party defendant." See, *e.g.*, *Faville v. Burns*, 2011 IL App (1st) 110335, ¶ 26 (legislature's use of separate terms in multiple places throughout statutory provision "strongly indicates it intended the terms to have separate and distinct meanings"). We reject Ponto's and Levan's argument that use of both terms simply reflects how the jury is to attribute total fault and does not negate the fact that section 2-401(d) states that third-party defendants constitute defendants. In our view, their reading is not a reasonable construction of section 2-1117 and, instead, constitutes a contorted reading of the statute.

¶ 51    Neither *Unzicker*, upon which Ponto and Levan rely, nor *Stephens*, upon which the City

-13-

relies, is particularly helpful. In *Unzicker*, a worker was injured in a food company's (Kraft's) plant and he and his wife sued the company, alleging negligence and violations of the Structural Work Act (740 ILCS 150/0.01 *et seq.* (West 1992), repealed by Pub. Act 89-2 (eff. Feb. 14, 1995)). Kraft filed a third-party complaint for contribution against the worker's employer (Nogle). A jury awarded over $879,000 in damages, $788,000 of which were nonmedical. It also apportioned fault at 1% on Kraft's part and 99% on Nogle's part. On appeal, the plaintiffs argued that Nogle should not have been included in the division of fault, because it was protected from suit by the Worker's Compensation Act (820 ILCS 305/1 *et seq.* (West 2000)) and was not a party who "could have been sued" (Ill. Rev. Stat. 1991, ch. 110, ¶ 2-1117) by the plaintiffs. The plaintiffs also argued that section 2-1117 was unconstitutional. As to the primary issue on appeal, the supreme court held that a plaintiff's employer who is a third-party defendant is a party who could have been sued by the plaintiff. *Unzicker*, 203 Ill. 2d at 77. The court also held that section 2-1117 does not conflict with the Contribution Act (primarily because it comes into play before the Contribution Act) and does not conflict with the purpose of joint and several liability. *Id.* at 80-83. The court also rejected the plaintiff's constitutional challenges. *Id.* at 88-96.

¶ 52    Nowhere in *Unzicker* did the supreme court address the specific question before this court. Ponto concedes as much, as she states that *Unzicker* implicitly supports her position. To her detriment, she relies on a portion of the facts section of the opinion wherein the court noted that the trial court found that Kraft (the defendant) *and Nogle* (the third-party defendant) were jointly and severally liable for the plaintiff's medical expenses. *Id.* at 71. Again, this finding was not challenged on appeal and the court's recitation of the record does not aid Ponto. There is no statement in the case that Nogle, the third-party defendant, paid any amount to the plaintiff.

¶ 53    Similarly, the portion of the *Stephens* opinion upon which the City relies would constitute, at best, judicial *dictum*. See, *e.g.*, *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993) ("an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum*. [Citations.] *** [A] judicial *dictum* is entitled to much weight, and should be followed unless found to be erroneous."). However, as Ponto points out, *Stephens* was decided several years before the enactment of section 2-1117 and the precise issue raised in this appeal was not addressed by that court. Thus, it is of little use to our statutory analysis and illustrates only a third-party practice principle.

¶ 54    Levan further argues that section 2(b) of the Contribution Act places a draconian condition on his exercise of his right of contribution from the City. See 740 ILCS 100/2(b) (West 2008) (contribution right exists only for a tortfeasor "who has paid more than his pro rata share of the common liability," and "recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability."). Levan asserts that he first has to pay over $380,000 to Ponto (representing his 65% fault apportionment) and then his right is to reimbursement for only what he overpaid. Levan maintains that, even though he and the City are joint tortfeasors that share a common liability to Ponto, the City's contribution exposure is actually a phantom until he pays too much. He complains that "an absolutely literal payment-then-

reimbursement" cannot be the statute's purpose. We reject his argument outright because he ignores that Ponto failed to timely add the City as a direct defendant in her suit. The Contribution Act is structured to ensure that no tortfeasor pays more than his or her "own pro rata share of the common liability." 740 ILCS 100/2(b) (West 2008). Under the scenario that played out in this case, the trial court's order conforms with this goal.

¶ 55 Turning to section 3 of the Contribution Act, Levan argues next that the City can be required to contribute more than its share to him because Levan's full obligation is not collectible. 740 ILCS 100/3 (West 2008) ("no person shall be required to contribute to one seeking contribution an amount greater than his pro rata share unless the obligation of one or more of the joint tortfeasors is uncollectable. In that event, the remaining tortfeasors shall share the unpaid portions of the uncollectable obligation in accordance with their pro rata liability."). Thus, he says, the City has to pay 35% of Levan's uncollectible obligation. We reject this argument because, as we determined above, under the joint liability statute, the City does not owe any monies directly to Ponto. See *Unzicker*, 203 Ill. 2d at 80 (section 2-1117 is considered before the Contribution Act and is applied to determine liability); see also *Truszewski*, 292 Ill. App. 3d at 561 (Contribution Act provides a remedy for a person who has paid more than his or her *pro rata* share of the common liability by allowing him or her to seek contribution from a fellow joint tortfeasor who has not paid his or her *pro rata* share of the common liability). To read section 3 of the Contribution Act to undermine the joint-and-several-liability doctrine codified in the joint liability statute in a case where the plaintiff failed to timely add the third-party defendant as a direct defendant is illogical and unfair and constitutes a misreading of the statutes and the legislative intent.

¶ 56 Levan goes further and, relying on section 4's statement that nothing in the Contribution Act affects a plaintiff's right to recover the full judgment amount from any defendant subject to liability in tort, also suggests that, if things were truly fair, then the statute should not affect Ponto's right to recover the full judgment amount from the City. He emphasizes that the jury found the City actually liable for its 35% fault and argues that the municipality "cannot hide behind the hypertechnical nomenclature of third-party defendant to suggest that it is not *literally* liable to" Ponto. (Emphasis in original.) We reject this argument outright because we cannot agree that a party's status as a third-party defendant constitutes mere hypertechnical nomenclature.

¶ 57 In summary, the trial court did not err in finding that, unless and until Levan pays more than 65% of the verdict to Ponto, the City owes nothing.

¶ 58 B. City's Cross-Appeal–Discretionary Immunity

¶ 59 In its cross-appeal, the City maintains that the trial court erred in denying multiple motions wherein the City sought to assert its immunity for the discretionary acts of its employees. Specifically, the City argued that decisions concerning the plan for improvement of the City's water distribution system were made and carried out by Cox and that formulation of the water main plan was ongoing at the time of Ponto's accident. Further, because the decisions involved the exercise of discretion, the City argues that Cox could not be liable under section 2-201 of the Tort Immunity Act (and, thereby, section 2-109 of the

statute). It requests that we enter judgment in its favor or remand for a new trial. For the following reasons, we reject the City's argument.

¶ 60    Preliminarily, we address Levan's argument that this court does not have jurisdiction over the City's cross-appeal. On April 7, 2011, Ponto timely filed her notice of appeal from the trial court's March 30, 2011, order (disposing of the last pending postjudgment motion). On April 11, 2011, the City timely filed its notice of cross-appeal, seeking to raise the discretionary immunity issue and specifically noting that it was appealing from, among others, the court's March 30, 2011, order and its January 26, 2011, order (in which it entered judgment on the jury's verdict). On April 26, 2011, Levan timely filed his notice of appeal, noting that he was appealing from the trial court's March 30, 2011, order and its January 26, 2011, order. Levan argues that this court lacks jurisdiction over the City's cross-appeal because he did not become a party to this appeal until his notice of appeal was filed (after the City's notice) and it was incumbent on the City to thereafter file a new notice of cross-appeal or move to amend its initial notice, which it did not do. In other words, Levan contends that the City never *directly* cross-appealed against him. We reject this claim. Illinois Supreme Court Rule 303(a)(3) provides that, if a timely notice of appeal is filed and served by a party, then "any other party *** may join in the appeal, appeal separately, or cross-appeal by filing a notice of appeal, indicating which type of appeal is being taken." Ill. S. Ct. R. 303(a)(3) (eff. May 30, 2008). Levan cites to no authority suggesting that a party must file a new or amended notice of appeal following a second appellant's subsequent notice of appeal.

¶ 61    Turning to the merits, the Tort Immunity Act is in derogation of the common law and, therefore, must be strictly construed against the public entities involved. *Aikens v. Morris*, 145 Ill. 2d 273, 278 (1991). In order to bar plaintiffs' recovery, governmental entities bear the burden of properly raising and proving that they are immune under the Tort Immunity Act. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). We review *de novo* the application of the immunity provisions (*Gutstein v. City of Evanston*, 402 Ill. App. 3d 610, 615-16 (2010)), as we do a motion for a directed verdict (*Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010)). We review for an abuse of discretion a ruling on a motion for a new trial. *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 32.

¶ 62    Section 2-201 of the Tort Immunity Act provides:

"§ 2-201. Except as otherwise provided by Statute, a public employee serving in a position involving the *determination of policy or* the *exercise of discretion* is not liable for an injury *resulting from his act or omission in determining policy when acting in the exercise of such discretion* even though abused." (Emphases added.) 745 ILCS 10/2-201 (West 2008).

¶ 63    Section 2-109 of the statute provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2008). In section 2-201, the legislature immunized "liability for both negligence and willful and wanton misconduct." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 196 (1997).

¶ 64    Our supreme court has held that the Tort Immunity Act sets up a two-part test to

determine which employees may be granted discretionary immunity under section 2-201. First, an employee may qualify for discretionary immunity "if he holds *either* a position involving the determination of policy *or* a position involving the exercise of discretion." (Emphases in original.) *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998). Second, however, an employee who satisfies the first prong of the test must also have engaged in both the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted. *Id.* Here, the trial court found against the City on both prongs.

¶ 65     1. First Prong: Whether the Position Determines Policy or Exercises Discretion

¶ 66     As to the first prong, the trial court found that, in the hierarchy of decision-makers, Cox was in the "fourth rung" after: the city council, a commissioner, and Ortgiesen (the City engineer). The court also found that Cox exercised "some" discretion "in certain situations." Ponto concedes that Cox's position could involve the exercise of discretion. We agree. Notwithstanding the fact that he did not make the final decision for the City on water main improvements, the evidence reflected that his recommendations were taken into consideration.

¶ 67          2. Second Prong: (a) Whether the Act Involved a Policy Determination

¶ 68     Public policy decisions are "those that require the governmental entity or employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests." *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 472 (2001). The City and (often) the case law conflate the concepts of policy determination and the exercise of discretion. See, *e.g.*, *Gutstein*, 402 Ill. App. 3d at 623. However, the trial court separately addressed the concepts. Specifically, as to policy, the court found that, although Cox "provides a great deal of information [to the City,] he can take no action until the city council appropriates the money and in this particular case until they authorize the engineering agreement." The court found that the City ultimately appropriated funds and then instructed the department that it could commence work.

¶ 69     The City appears to argue that Cox determined policy when he sought out the best solution (which it concedes was subject to the city council's and Ortgiesen's approval) for improving the water main under River Street (but not under River Road). However, it contends that it was in the process of planning improvements in one area when *the accident* put it on notice of the possible need for more extensive maintenance. The City notes that both Cox and Ortgiesen testified that they had discussed the repair and replacement (*i.e.*, they formulated an improvement plan) of the River Street section of the City's water main. The City urges that the planning for the water main replacement under River Street was in its *early stages* on the accident date and was not being implemented.

¶ 70     Ponto responds that Cox did not make any policy determination concerning River *Road*. Rather, the items he took into account (*i.e.*, safety, convenience, and cost) came into play in his decision whether to make the repairs on River *Street*. She points to his testimony that the first time he thought there might be an issue with the pipes on River Road was on the

accident date and that there were no red flags earlier.

¶ 71    We agree with Ponto that Cox did not balance any competing interests with respect to any policy determination concerning the River Road water main (*i.e.*, the location of the February 2, 2008, leak). He clearly testified that the River Street and River Road projects were distinct undertakings. Significantly, Cox stated that he did not determine that the River Road water main was faulty and initially attributed the single leak in that area (in October 2007) to a water hammer. Cox first suspected that there might be recurring leak issues with the River Road main *after* Ponto's accident, and he did not discuss with Ortgiesen the need to budget for a project in that area until March or April 2008. Indeed, Ortgiesen testified that, in late 2007, he did not have any discussions with Cox about the River Road main, because they "never had reason to." Thus, on the date of Ponto's accident, Cox was not involved in a policy determination concerning River Road.

¶ 72    3. Second Prong: (b) Whether the Act Involved the Exercise of Discretion

¶ 73    "[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995). " 'A municipal corporation acts judicially or *exercises discretion when it selects and adopts a plan* in the making of public improvements, *but as soon as it begins to carry out that plan it acts ministerially* and is bound to see that the work is done in a reasonably safe and skillful manner.' " (Emphases added.) *Greene v. City of Chicago*, 73 Ill. 2d 100, 108 (1978) (quoting *Johnston v. City of East Moline*, 405 Ill. 460, 466 (1950)). Thus, a municipality is not immune from liability for the performance of ministerial tasks. *Morrissey v. City of Chicago*, 334 Ill. App. 3d 251, 257 (2002). The maintenance of property consists of keeping it in a state of repair or efficiency and constitutes a ministerial task, while the improvement of property is a discretionary act. *Id.* at 256. Generally, a repair is a ministerial act for which a municipality may be liable if negligently performed. *Id.* at 257. For example, if a pothole repair is executed pursuant to a set procedure with no room for discretionary decisions, it is a ministerial act. *In re Chicago Flood Litigation*, 176 Ill. 2d at 196-97. Whether an act is discretionary or ministerial is, generally, a fact-specific inquiry. *Hanley v. City of Chicago*, 343 Ill. App. 3d 49, 57-58 (2003); see also *Roark v. Macoupin Creek Drainage District*, 316 Ill. App. 3d 835, 841 (2000) (issue whether a defendant drainage district's decision *not* to repair a drainage system was discretionary or ministerial presented a factual question precluding dismissal of complaint).

¶ 74    Here, the trial court found that the City had *commenced* the implementation of its improvement plan and that, therefore, its actions were not discretionary. The City concedes that the duty to inspect and maintain is generally ministerial. However, it asserts that Cox exercised discretion when he decided to end the (River Street) improvement project 8 to 10 feet from the accident site. In his opinion, the section of the City's water main to the south and west of where River Road, River Street, and Ravine Avenue meet needed to be improved. He took into account competing interests of cost, convenience, and safety. Finally,

-18-

the City also asserts that Cox's testimony that he believed there were no problems under River Road that warranted improvement was the type of judgment that constitutes discretion.

¶ 75    Ponto responds that whether or not any improvement plan was commenced is irrelevant and that the central consideration is whether Cox exercised any discretion. Again, in her view, Cox did not have discretion, because the decision whether to replace the water main had to go through a hierarchy of decision-makers, including the city council and Ortgiesen. Thus, the decision was not unique to a particular public office and was not a discretionary act.

¶ 76    We conclude that, on the accident date, Cox was not exercising discretion with respect to any improvement or plan concerning River Road. Again, his decisions as to any improvement concerned River Street and not River Road. On December 3, 2007, the City entered into an engineering agreement that addressed only the River Street project. The engineering agreement for the River Road main was executed on November 3, 2008, following discussions between Cox and Ortgiesen that commenced in March or April 2008, one or two months after Ponto's accident. We reject the City's argument that Cox made a discretionary decision to *delay* any improvement under River Road, as his statements reflect that he was not even *aware* of any recurring leak issues with that pipe.

¶ 77    In sum, under the foregoing facts and principles and under either standard of review, the City cannot avail itself of discretionary immunity.

¶ 78                                    III. CONCLUSION

¶ 79    For the foregoing reasons, the judgment of the circuit court of Lee County is affirmed.

¶ 80    Affirmed.